CHARLES S. ROSENSWEIG, Transacting Business as STEPHENS & Co., Respondent, *v.* ALBERT W. WHITNEY, Individually and as Manager (President) of Central Bureau for Clearing Earned Premiums under Not Taken and Canceled Casualty Policies and Binders, an Unincorporated Association Having over Seven Members, and Another, Appellants.

First Department, May 13, 1927.

Insurance — casualty insurance — action to restrain defendants from putting into operation certain plan relating to brokers — plan required brokers to assume responsibility for earned premiums unless order was signed by applicant — brokers were required to give insurance history of applicant — defendant association is part of rating organization under Insurance Law, § 141 — said plan does not constitute authorized rules — plan violates Insurance Law and its use is restrained.

This is an action by an insurance broker to restrain the defendants from putting into operation a plan for clearing earned premiums under not taken and canceled casualty insurance policies and binders. The purpose of the alleged plan is to provide against so-called "free insurance" which results from the return after one or two months from the date of issuance of insurance policies as "not taken." The contention of the defendants that they do not constitute a rating organization, within the meaning of section 141 of the Insurance Law, cannot be sustained, for it appears that the defendant, a voluntary unincorporated association, was organized as a part of the National Bureau of Casualty and Surety Underwriters, a rate-fixing organization. Therefore, the defendant association is either a part of the National Bureau of Casualty and Surety Underwriters, a rate-making organization, or it is an agent of that body.

The plan in question makes all insurance brokers responsible for the payment of earned premiums unless the order for insurance is signed by the applicant, the insured, or accompanied by his written authority or unless the policy is returned within ten days or the applicant shall be adjudged a bankrupt. The plan also requires the brokers to give the insurance history of the applicant. The plan does not come within the meaning of rules authorized by the Insurance Law for the government of rate-fixing organizations. A provision that an insurance broker shall become responsible for the earned premiums under the conditions stated does not constitute a rule, but imposes a new and distinct obligation on the broker, unjustified by the law and unreasonable. Furthermore, it was unreasonable to require brokers to state absolutely of their own knowledge the insurance history of the applicant and that part of the plan cannot be characterized as an authorized rule. Since said plan is not authorized by the Insurance Law and is in violation thereof, an order granting plaintiff's motion for an injunction *pendente lite* is affirmed.

APPEAL by the defendants, Albert W. Whitney and another, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 22d day of April, 1927, granting plaintiff's motion for an injunction *pendente lite*.

*Henry L. Sherman* of counsel [*Lionel S. Popkin* with him on the brief; *Hirsch, Sherman & Limburg,* attorneys], for the appellants.

*Thomas Gilleran,* for the respondent.

Order affirmed, with ten dollars costs and disbursements, upon the opinion of BIJUR, J., at Special Term.

Present — DOWLING, P. J., FINCH, MCAVOY, MARTIN and O'MALLEY, JJ.

The following is the opinion of the court below:

BIJUR, J.   This is an application for a temporary injunction. Plaintiff is an insurance broker, defendant association is the " Central Bureau for clearing earned premiums under not taken and canceled casualty policies and binders," an unincorporated association. The prayer of the complaint is in substance that defendant be enjoined from making effective a plan relating to applications for casualty insurance, to which I shall presently advert.   Section 141 of the Insurance Law as in effect May 21, 1923, permits insurance corporations to combine for the purpose of establishing rate-making associations, or rating organizations as they are alternatively denominated, for the purpose of " suggesting, approving or making rates to be used by more than one underwriter for insurances." An organization of this kind was formed in November, 1921, under the title of National Bureau of Casualty and Surety Underwriters. At intervals until August, 1926, its members or governing body discussed the problem presented by what is known as " free insurance " resulting from the return, after one or two months from the date of their issuance, of policies as " not taken."   A plan was evolved which resulted in the organization of the defendant (which I shall call the Central Bureau).   I cannot find among the papers submitted anything to indicate the precise date of its organization, but it seems to have been formed some time in January or February, 1927; perhaps simultaneously with the promulgation of the " rules and procedure " objected to.   Its constitution, under " Article I — Name," says: " There shall be created within the National Bureau of Casualty and Surety Underwriters an organization known as the ' Central Bureau for Clearing Earned Premiums Under " Not Taken " and Canceled Casualty Policies and Binders,' hereinafter referred to as the Central Bureau."   This I take from a circular issued by the Central Bureau addressed to brokers under the title " To All Producers in New York State."   The term " producers " is concededly intended to designate brokers.   There are " rules and procedure " appended, stated to become effective on February 15, 1927.   They provide *inter alia* that new business will

First Department, May, 1927.          [Vol. 221

be accepted only if submitted on the uniform order blanks provided. The rules require that on the reverse side of the blanks there shall be indorsed " conditions governing the acceptance of the order." The chief " condition " in substance is that the producer (broker) agrees to become " responsible " for the payment of the earned premiums from the effective date of insurance unless the order is signed by the applicant (customer) or accompanied by his written authority, or the policy is returned " not taken " within ten days, or the applicant be adjudged a bankrupt, etc., or the applicant has in writing accepted the insurance or paid the initial premium, or made a loss claim thereunder. This " condition " is the main cause of complaint by plaintiff. The accompanying uniform. order blanks required to be filled out represent that the applicant has no insurance " except ———; the applicant has not sustained nor received indemnity for any loss   *   *   *   within the last five years except ———," and that no application for insurance " by the applicant has ever been declined or canceled except ———." Provision is made for the signing of these blanks by the broker, which is evidently the usual course. Particular objection is made also to the preceding three items, as I shall explain later on. I think it may fairly be said that the entire present controversy, and certainly the major claims of the plaintiff, arise under subdivision 6 of section 141 of the Insurance Law, reading as follows: " 6. Such rating organization or any other person, corporation, association or bureau shall not charge any licensing, registration, certification or membership fee to brokers who shall have been or hereafter may be licensed or authorized as such pursuant to the provisions of this chapter; nor shall any such rating organization or any other association or bureau refuse to do business with or prohibit or prevent the payment of commissions to any person who may be licensed or authorized as an insurance broker, pursuant to the provisions of this chapter, except for the reason that such a broker will not agree to adhere to the reasonable rules of such rating organization." Plaintiff assails the validity of the rules or requirements to which I have alluded as either forbidden or at least unauthorized by law altogether or as unreasonable if regarded as rules under subdivision 6 of section 141 (*supra*). Defendant, on the other hand, insists that if they be rules under the latter section they are reasonable, and next that they are not " rules of such rating organization " at all under the language of that section because defendant is a wholly independent unincorporated association of representatives of insurance companies. I do not quite understand defendant's alternative claim that it is not a rating organization. In the first place, its very constitution recites that it " shall be created *within*

the National Bureau," etc., which is concededly the rating organization of the companies doing business in this vicinity. In the next place, the principal affidavit submitted by defendant recites that in order to make rates "reasonable and adequate, it was necessary for the association [National Bureau] to promulgate such rules as would result in the obtaining of premiums for all insurance issued, and as would prevent the obtaining of what has been known in the insurance world as ' free insurance,' " and that after the matter had been " considered at the annual meeting of the National Bureau of Casualty & Surety Underwriters held in May, 1923, in so far as it affected premiums for casualty insurance," a committee was appointed and a "plan for the formation of the said Central Bureau was finally evolved at a meeting of the National Bureau of Casualty & Surety Underwriters in August, 1926. The reports of the various committees were received and considered and a resolution that the plan of the committee with respect to the evil of not-taken policies in the casualty insurance field be approved, was adopted; and it was provided that it should be promulgated, and application thereof thereafter undertaken in the State of New York." In another affidavit it is set out that " in order to make a proper rate it is necessary for such an organization [namely, a rating organization] to view the entire field and in that connection to endeavor * * * to bring about conditions which will eliminate wastage, expense, unauthorized insurance transactions," etc. The entire plan is sought to be justified by defendant itself on the plea that it will have an immediate and direct effect upon rates. Having that in mind, defendant and its coadjutors have sought the approval and co-operation of the Superintendent of Insurance under a liberal interpretation of his powers in regard to the validation of rates. It appears to me, therefore, to be evident that the defendant Central Bureau is either an integral part of the National Bureau, the rate-making organization, or its mere agent to carry out some of its claimed purposes, although organized ostensibly as an independent unincorporated association. From this standpoint the first question is whether the provisions objected to may properly be regarded as "rules." Judge POUND, speaking for the Court of Appeals in *Matter of Importers & Exp. Ins. Co.* v. *Rhoades* (239 N. Y. 420), and interpreting section 141-a (relating to fire insurance companies, which so far as it defines or describes "rules" is the same as the general section 141), indicates that the power of rating organizations to make rules is limited to "rules affecting such rates and charges of the rating organization" or "rules * * * employed in computing the rates." It manifestly was not intended by the Legislature under this construction that rating organizations

should be allowed to impose substantive obligations or penalties on the community or on brokers — on the theory that they might indirectly affect rates of insurance. A provision that a known agent for a known principal shall be liable for the latter's obligation is not a " rule " at all. This so-called rule might be effectuated by contract between two willing parties or might possibly be imposed by the State as a legislative enactment; but the enforced subversion by a private body of a time-honored legal principle does not seem to me to fall within any definition of a " rule." One of the affiants on behalf of defendant says: " No broker will incur any damage unless it be the result of his acting on behalf of a principal without being authorized so to do." As the law stands without the " rule," it is the insurer who incurs no " damage " whether the broker be authorized or not, because in the former case the insurer can recover from the principal as such, and in the latter from the broker by way of breach of warranty of agency. The defendant claims that in this situation it is subject to abuses and loss of premiums, a claim which can be explained only on the theory that the companies are unwilling to prosecute their just claims or perhaps unable, for some unexplained reason, to recover thereon. The effect of this " rule " is to place the burden of such collection, thus presumed to be unfeasible or impossible, upon the broker, at least in every case where his authorization is not in writing. I must confess also that I am unable to define satisfactorily to myself what the legal status of the broker would be if this " rule " were enforced. It might be fair to assume that he could be regarded as a guarantor, in which case he would be put to the added disadvantage that he could not avail of counterclaims due from the insurer to the insured. (*Gillespie* v. *Torrance*, 25 N. Y. 306; *Newton* v. *Lee*, 139 id. 332.) If his " responsibility " for the premium could be viewed as a liability necessarily incurred in the course of his agency, though unknown to his principal, the insured would lose the availability of any counterclaim against the insurer when he came to be sued by the broker. It may be that the insurers are unwilling to incur the risk of the curtailment of business which might result from requiring that all authorizations to effect insurance shall be in writing. That, however, is no excuse for visiting the burden upon the broker. To say, therefore, that under the rule the broker incurs no " damage," is either manifestly incorrect or involves the equally absurd assumption that the rule as formulated is wholly unnecessary and without purpose. In either aspect it appears to me to be unreasonable. If the purpose be to punish or penalize insolvent brokers who make a practice of effecting insurance without due authorization, the statute plainly provides

a wholly different and perhaps exclusive remedy, namely, an application to the Superintendent of Insurance for appropriate disciplinary action under section 143. It has not been questioned before me, and I think it will be conceded, that a provision that all brokers are required to comply with a certain condition before their orders for insurance will be accepted, is equivalent to " refusing to do business with them " except upon that condition. I think also that the further requirement that the broker shall make statements or representations in regard to acts by, or occurrences in the life of his principal, the assured, is calculated to lead to serious complications and difficulty besides imposing liability upon the broker for statements required of him which may in fact turn out to be wholly false though made in the utmost good faith. To put it in a more concrete form: I do not understand the legal significance of a statement required of an agent that something has or has not happened in the past history of his principal, and I deem it unreasonable to demand of such an agent that he make such a statement as of his own knowledge as a prerequisite to pursuing his licensed course of business, because it must necessarily involve him in an undefined and unlimited liability without his consent. If a conscientious broker were free to act as, and state what, he chose, he would expressly restrict his own responsibility in the premises by alleging that he had been so informed and was making the representation solely on the faith of his principal's statement to him. That, however, would not conform to the rigid requirement of the defendant. The conclusions at which I have arrived from a bare examination of the statute are confirmed by a study of the circumstances under which it was passed and by interpreting it as did the Court of Appeals in the *Rhoades Case* (*supra*), in the light of the reports of the Merritt and Lockwood committees which preceded it. As a result of certain abuses which had existed chiefly in the business of fire insurance, a joint committee of the Legislature, commonly known as the Merritt committee, held a prolonged investigation and submitted a report in February, 1911. (New York Assembly Documents, 1911, vol. 20, No. 30.) In this report (at pp. 76 *et seq.*) the committee pointed out the importance of " rating " in the insurance world generally, and indicated a preference for permitting combinations of insurance companies for rate ascertainment and fixing, under State control. Four or five pages, beginning at page 98, are devoted to the subject of brokers. The insurance companies had formed a monopolistic exchange which was charged with establishing unfair and discriminatory rates. In addition thereto it had undertaken to " license " brokers and to demand of them certain pledges solely in the interest of the insurers.

The committee reported that in this congested locality insurers substantially never came in contact with the insured; that the brokers, although middlemen, substantially controlled and directed their clients' insurance and acted not only as brokers but generally as advisers to and collaborators with their clients. After suggesting that the brokers should be licensed by the State and placed under its appropriate control and discipline for the purpose of insuring their efficiency and trustworthiness, the report goes on (at p. 102): "When however the companies leave the condition of open competition and form combinations it is recognized that the State may rightly take steps to guarantee to the public that this power * * * shall not be abused.. * * * In its recommendations however, your committee goes a step further than to provide merely for publicity; it is prepared to recommend that combinations of companies should not be allowed to exercise a control over brokers. * * * It is believed that the good of the business demands combination but this combination must not be maintained by a control over a non-participating outside element. Whatever powers are necessary to secure the proper activity of the broker should be assumed by the State." At page 125, after recommending that the companies be allowed to form and use rating associations, it added: "And such statute should also provide that while companies may maintain proper rate-making associations and exchanges and agree to maintain the rates so made, they must not seek to strengthen their own agreement by forcing third persons to help them do so. In other words the licensing of and control over brokers should cease, and the present situation wherein rate-making exchanges and associations wield a power which properly belongs to government should be ended." It may be said in general that the report of the Merritt committee, supplemented in some respects by the so-called "Intermediate Report" of the subsequent Lockwood committee (Legislative Documents, 1922, vol. 15, No. 60), recognized the outstanding importance in the field of insurance of the ability to formulate and enforce rates, as also of the position and co-operation of insurance brokers that the committee, while not expressly prescribing whether insurance companies might combine for other purposes, provided how they might combine for rate-making, and placed that subject under State control and supervision, and that as to insurance brokers it similarly, in section 143, awarded control and supervision to the State and, coincidently, forbade the exercise of the latter functions by the insurers. The able counsel of the defendant has suggested that the bill recommended by the Merritt committee, and subsequently enacted in changed form as subdivision 6 of section 141, hereinabove discussed,

incorporated an inhibition against interference with brokers which was not approved by the Legislature or adopted in the measure as passed. The clause in question forbade the rating associations to " refuse to do business with * * * a licensed insurance broker upon the ground that such broker offers insurance to other persons not members of such association or because he will not agree to secure insurance only at the rates fixed by such association or seek to restrain or interfere with any such licensed broker in the transaction of his business in any manner other than by proceeding against such broker according to law for violation thereof." I cannot agree with the view of counsel that the measure as passed is milder or more moderate in its forbiddance than was the original recommendation just quoted. On the contrary, it seems to me that subdivision 6 of section 141 forbids the rating association from refusing to do business with a broker, not for a few enumerated reasons, but *for any reason whatsoever* except for the reason that the broker will not adhere to the reasonable rules of the rating organization. In my opinion, an injunction should issue against the operation of the plan complained of. Settle order.